IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KENNETH T. BORNSTAD           :
   Administrator of the Estate   :
   of KEITH B. BORNSTAD,      :       CIVIL ACTION
   Deceased                   :
                              :
   v.                         :
                              :       NO. 03-CV-3822
HONEY BROOK TOWNSHIP,          :
ET AL.                         :

SURRICK, J.                                           SEPTEMBER 9, 2005

## MEMORANDUM & ORDER

Presently before the Court are the following Motions:  (1) Defendants West Brandywine Township, Sergeant John Coldren, Officer Denise Knoke, And Corporal Daniel Shappell's Motion For Summary Judgment (Doc. No. 42); (2) Defendants Honey Brook Township, Officer William Baxter, And Officer Michael Sasso's Motion For Summary Judgment (Doc. No. 43); (3) Plaintiff Kenneth T. Bornstad's Motion In Limine To Preclude All Evidence Of Decedent Keith B. Bornstad's Alleged Prior Marijuana, Cocaine, Or Other Drug Use (Doc. No. 55); (4) Plaintiff's Motion In Limine To Preclude All Evidence Of Decedent Keith Bornstad's Alleged Prior Alcohol Use (Doc. No. 56); (5) Plaintiff's Motion In Limine To Preclude All Evidence Of Decedent Keith Bornstad's Prior Arrests And Charges (Doc. No. 57); (6) Defendants' Joint Motion In Limine To Preclude Lorraine Barlow's Testimony (Doc. No. 58); (7) Defendants' Joint Motion In Limine To Preclude Any Evidence From Plaintiff's Liability Expert, R. Paul McCauley (Doc. No. 59); (8) Defendants' Joint Motion In Limine To Preclude Any Hearsay Testimony From Angela Eckert (Doc. No. 60); (9) Defendants' Joint Motion In Limine To

Preclude Trial Testimony Of Plaintiff's Expert, Ian C. Hood, M.D., Ch.D., J.D. (Doc. No. 61);

(10) Defendants' Joint Motion In Limine To Preclude Testimony Of Dr. Rodger Rothenberger

(Doc. No. 64); (11) Defendants' Joint Motion In Limine To Preclude Reference To The Use Of

OC Spray By The Police Officers As Having Been Improper Or Having Contributed To

Plaintiff's Death (Doc. No. 65); (12) Defendants' Joint Motion In Limine To Preclude Reference

To "Blue Wall" Or "Blue Line" (Doc. No. 68); (13) Defendants' Joint Motion In Limine To

Preclude Reference To Any Meeting Of The Defendant Officers With Their Fraternal Order Of

Police Attorney As Having Been Improper (Doc. No. 69); (14) Defendants Honey Brook

Township, Officer William Baxter, and Officer Michael Sasso's Motion In Limine To Preclude

Plaintiff From Presenting Any Evidence Of Events Involving William Baxter That Occurred

Subsequent To The Bornstad Incident (Doc. No. 73); and (15) Plaintiff's Motion To Preclude

Testimony Of Dr. G. John DiGregorio As To Decedent Bornstad's Alleged Use Of Cocaine And

To Preclude His Testimony Under Daubert And Rule 403 That The GCMS Is A Better

Diagnostic Tool Than The FPIA (Doc. No. 84). For the following reasons, the Motions will be

granted in part and denied in part.

## I.      BACKGROUND

### A.      Facts

On June 6, 2002, Keith B. Bornstad resided at 6 Quail Lane in Honeybrook,

Pennsylvania, with Lorraine Barlow and her seven-year-old daughter. On the evening of June 6,

2002, Bornstad came home drunk and began an altercation with Barlow. (Barlow Dep. at 11-12,

76-77.) After Bornstad hit Barlow in the face, Barlow dialed 911 and then hung up the

telephone. (*Id.* at 12-13; Baxter Dep. at 52.) Officer William Baxter and Officer Michael Sasso

2

were dispatched to Bornstad's residence at approximately 9:15 p.m.  (Doc. No. 66; Sasso Dep. at 12.)  When Baxter and Sasso arrived there at approximately 9:20 p.m. (Doc. No. 66), Bornstad answered the door.  (Baxter Dep. at 56.)  Sasso told Bornstad that they were responding to a 911 hang-up, which was not answered when the county dispatch tried to return the call.  (*Id.* at 57; Sasso Dep. at 16.)  Bornstad acknowledged that 911 was called because there was a problem, but claimed that the problem had been resolved.  (Sasso Dep. at 17.)  At that time, Barlow walked up behind Bornstad and stated that Bornstad "was going to lie like he usually does to keep from getting in trouble."  (*Id.* at 17-18.)  Sasso noticed that Barlow was upset and that she had been crying.  (*Id.* at 18.)

Sasso instructed Bornstad to leave the residence and then Sasso went inside to talk to Barlow.  (Baxter Dep. at 57, 63; Sasso Dep. at 18.)  As Sasso walked past Bornstad, he smelled alcohol.  (Sasso Dep. at 35.)  Barlow told Sasso that Bornstad had returned home, that he had been drinking and that he was agitated.  (*Id.* at 20.)  She said that they began to argue, and that Bornstad then hit her in the face.  (*Id.*)  Barlow told Sasso "that she was extremely concerned because she had just had surgery on her neck and she felt that she could no longer take this type of abuse."  (*Id.* at 21.)  Barlow stated "that it was a common occurrence that [Bornstad] would come home intoxicated and abuse her."  (*Id.*)  She also told Sasso that Bornstad had bitten her daughter on her back.  (*Id.*)  Sasso observed a bite mark "in the center of [the daughter's] back between her shoulder blades."  (*Id.* at 22.)

Sasso then spoke with Barlow's daughter, who told him that "she was in her bedroom sitting on the bed playing a game on the computer, [and] Mr. Bornstad came in and told her to turn the game off and she said for some reason he snuck around behind her and got onto the bed

3

and that's when she was bit in the center of the back." (*Id.* at 23.)  The daughter also told Sasso that Bornstad bit her on her right cheek.  (*Id.* at 23.)  Sasso noted that there was a red mark on the daughter's right cheek.  (*Id.*)

Bornstad had exited the house while Sasso was talking to Barlow and her daughter, and Baxter met Bornstad on the porch.  (Baxter Dep. at 64.)  Baxter again explained to Bornstad that he and Sasso had come to his residence because there was a 911 hang-up that was not answered when the county dispatch tried to return the call.  (*Id.* at 63, 65.)  At this point, Bornstad was not acting in a threatening manner.  (*Id.* at 64.)  While Bornstad and Baxter were standing outside the house, Baxter smelled "a strong odor" of alcohol on Bornstad's breath.  (*Id.* at 51.)  When Baxter asked Bornstad what had happened, Bornstad replied that nothing had happened and that everything was fine.  (*Id.* at 66.)  After this brief initial conversation, Baxter and Bornstad simply stood on the porch and waited for Sasso.  (*Id.* at 66.)  During this period, Bornstad was looking inside the house and observing Sasso's conversation with Barlow and her daughter.  (*Id.* at 66-67; Sasso Dep. at 25-26.)  As Sasso was talking to the daughter, Bornstad began to curse, became "more and more agitated," and grew loud and angry.  (Sasso Dep. at 25.)

After talking to Barlow's daughter, Sasso exited the residence and advised Bornstad that he was under arrest.  (Baxter Dep. at 58; Sasso Dep. at 24.)  He asked Bornstad to turn around and to place his hands behind his back.  (Baxter Dep. at 71; Sasso Dep. at 24.)  Bornstad refused to comply.  As the officers attempted to grab his arms, Sasso told Bornstad not to resist.  (Baxter Dep. at 72; Sasso Dep. at 32.)  Bornstad then hit Baxter in the chest with closed fists and knocked him down on the porch.  (Baxter Dep. at 59, 72, 74; Sasso Dep. at 32.)  He also struck Sasso in the chest with his fist.  (Sasso Dep. at 47.)

4

After Baxter got back on his feet, both officers again tried to grab Bornstad's arms.  At this point, Bornstad broke free and began to swing both arms.  (Barlow Dep. at 37; Sasso Dep. at 33.)  Bornstad was flailing his arms, attempting to keep the officers at a distance.  (Sasso Dep. at 49-50.)  As he was yelling profanities at the officers, Bornstad hit Sasso again in the chest and all three individuals fell on the front porch.  (*Id.* at 33.)  After they fell on the porch, the officers "managed to grab a hold of [Bornstad's] arms again and while holding onto him he stood up off the ground and basically picked both of [the officers] up with him."  (*Id.* at 34.)  Both Baxter and Sasso told Bornstad to stop fighting, but Bornstad continued to yell profanities, continued to swing his arms, and continued to fight with the officers.  (*Id.*)  After Bornstad stood up, Baxter and Sasso again tried to grab his arms, at which point they all fell down a second time and landed in Bornstad's flower bed.  (*Id.* at 34, 36.)  At approximately 9:35 p.m. (Doc. No. 66), Baxter requested backup through his radio.  At that point, Baxter thought that [Bornstad] was going to kill us both and . . . I felt that we needed help."  (Baxter Dep. at 59; *see also* Coldren Dep. at 16.)

Even though Bornstad was on his back, he continued to fight, hitting Sasso several times.  (Sasso Dep. at 52.)  Sasso sprayed pepper spray into Bornstad's face, but this had no effect on Bornstad.  (*Id.* at 40.)  The officers continued to tell Bornstad to stop resisting and to put his hands behind his back (*id.* at 35), but "[e]very time we would give him a command to stop fighting or to stop resisting he would just yell f--- you."  (*Id.*; *see also* Barlow Dep. at 139.)  The officers tried to control Bornstad's arms as he was lying on his back on the ground.  (Sasso Dep. at 37.)  As Bornstad continued to struggle, and while Bornstad was still on his back, the altercation moved to the grass in front of Bornstad's house.  (*Id.* at 38.)  After they moved to the

front yard, Barlow came out of the house and began to yell at Bornstad.[1]  (*Id.* at 54.)  At this

point, both officers told Barlow to call 911 and request backup police officers, which she did.

(Barlow Dep. at 84; Baxter Dep. at 61; Sasso Dep. at 54.)

As Sasso and Baxter tried to place handcuffs on Bornstad, Bornstad grabbed Baxter's

throat and began to choke him.  (Sasso Dep. at 41-42.)  Sasso sprayed pepper spray in Bornstad's

face a second time.  (*Id.* at 42-43.)  The pepper spray had no effect on Bornstad, and he continued

to choke Baxter.[2]  (*Id.* at 44.)  Before the backup officers arrived, Baxter and Sasso were on

Bornstad's chest and back attempting to get him under control.  (Barlow Dep. at 14, 17, 19, 21.)

Barlow testified that "I saw them get on the back of him with the knee way because he had

already fought with them."[3]  (*Id.* at 17.)

---

[1]There is a dispute regarding whether Bornstad made any statements about his physical condition while Baxter and Sasso tried to restrain him.  Barlow testified that Bornstad "was yelling out" to Barlow for help during his struggle with these officers (Barlow Dep. at 22), and that he "was saying he was having trouble breathing.  He was saying to try to get the police off of his chest."  (*Id.*)  When Baxter and Sasso were trying to restrain Bornstad by themselves, "[h]e always had a complaint about his breathing. . . .  He was yelling that he was feeling pressure on his chest and was having a hard time breathing."  (*Id.* at 23.)  While Bornstad was on the ground, he also complained that he was having a heart attack.  (*Id.* at 55, 103-04.)  However, Baxter testified that Bornstad never expressed any complaints about his physical condition.  (Baxter Dep. at 77.)  Sasso also testified that Bornstad never said that he was having breathing problems, that he was having a heart attack, or that he was dying, and that he never complained about any medical problems.  (Sasso Dep. at 66-67.)

[2]Baxter also sprayed pepper spray in Bornstad's eyes on two occasions during this period, but the pepper spray had no apparent effect on him.  (Baxter Dep. at 42, 46.)

[3]Sergeant Coldren, Officer Knoke, Sasso, and Corporal Shappell testified that they did not observe any other officer put a knee on Bornstad's chest, back, neck, or head.  (Coldren Dep. at 31; Knoke Dep. at 29; Sasso Dep. at 77; Shappell Dep. at 32.)  Knoke, however, observed the officers on top of Bornstad when she arrived on the scene.  (Knoke Dep. Ex. 2.)

Eventually, the officers were able to break Bornstad's grip and to handcuff his hands in front of his body.  (Baxter Dep. at 60; Sasso Dep. at 44.)  At this point, Bornstad was on the ground lying on his back and kicking his legs while Baxter and Sasso were on either side of him, telling him to stop fighting.  (Baxter Dep. at 61-62, 81-82; Coldren Dep. at 28.)  At approximately 9:38 p.m., after Bornstad's hands were handcuffed, the backup officers began to arrive.  (Doc. No. 66; Coldren Dep. at 19, 23; Sasso Dep. at 46, 53.)  Bornstad continued yelling "[f]--- you, get away from me, don't touch me, leave me alone."  (Coldren Dep. at 91.)

When Sergeant Coldren, Officer Knoke, and Corporal Shappell arrived, they saw Barlow standing near the entrance to Bornstad's house.  (Coldren Dep. at 19, 27; Knoke Dep. at 22; Sasso Dep. at 53; Shappell Dep. at 27.)  Barlow was yelling at Bornstad while Bornstad was saying "I still love you to her."  (Knoke Dep. at 22.)  At some point after the backup officers arrived, Barlow went inside the house and she could no longer hear Bornstad.  (Barlow Dep. at 23.)  However, she watched the officers through a window from inside the home.  (*Id.* at 107.)

While Bornstad was still lying on the ground, the police officers, Baxter, Sasso, Coldren, Knoke, and Shappell, surrounded Bornstad.  Coldren went to Bornstad's right side, while Knoke tried to secure his feet.  (Coldren Dep. at 28-29.)  Even though the officers told Bornstad to stop resisting, Bornstad continued to fight.  He continued to use profanity and was growling at the officers.  (*Id.* at 29.)  Since Bornstad was still able to raise his hands in front of his body, the officers were concerned "that we were going to get hurt or he was going to get hurt."  (*Id.* at 30.)  As a result, it was decided that Bornstad should be handcuffed behind his back.[4]  (Sasso Dep. at

---

[4]The officers also wanted to change the position of Bornstad's handcuffs because a microphone cord was caught in one of them.  (Knoke Dep. at 20; Sasso Dep. at 58.)

58; Shappell Dep. at 26.)  The officers removed the handcuff on one of Bornstad's arms and turned him over.  (Coldren Dep. at 31.)  Bornstad resisted the officers, refusing to allow them to move his other arm.  (*Id.* at 31-33; Shappell Dep. at 27-28.)  Bornstad also continued to use profanity as he was being turned over.  He was yelling "f--- you guys, leave me alone, don't touch me, get away from me" (Coldren Dep. at 92) and "f---ing cops."  (Shappell Dep. at 27; *see also* Sasso Dep. at 59, 66.)

Bornstad then took his free hand and hit Shappell in the chest.  (Shappell Dep. at 28.)  After warning him several times that he should stop resisting, Shappell shot a burst of pepper spray into the ground near Bornstad's face.  (*Id.* at 29.)  After Shappell used the pepper spray, Bornstad "actually turned his head and looked up at [him] and screamed f--- you."  There appeared to be no reaction to the pepper spray.  (*Id.*)

Eventually, the officers were able to handcuff Bornstad's hands behind his back.  (Coldren Dep. at 31-34; Sasso Dep. at 58; Shappell Dep. at 28.)  After the officers got both hands handcuffed behind Bornstad's back, "he continued to fight, flail and kick" (Coldren Dep. at 33) and tried "to tear apart the handcuffs."  (Shappell Dep. at 31.)  He also continued to scream obscenities at the officers.  (*Id.*)

Because Bornstad was kicking at the officers, one of the officers tried to find a pair of leg shackles.  (Knoke Dep. at 34; Sasso Dep. at 60; Shappell Dep. at 33.)  When no leg shackles could be located, Shappell retrieved a first aid cravat, and this was used to bind Bornstad's ankles as he continued attempting to kick the officers.  (Coldren Dep. at 35; Sasso Dep. at 60-61; Shappell Dep. at 34.)  Even though Bornstad continued to resist after his ankles were bound (Coldren Dep. at 36, 66), he was finally "under control as long as everybody had a limb."

8

(Moran Dep. at 31.)[5]  The officers did not hear Bornstad complain that he was dying, that he was having difficulty breathing, or that he was having a heart attack.  (Coldren Dep. at 53; Knoke Dep. at 26, 38.)

The six officers then lifted Bornstad and carried him face down to Sasso's patrol car, and placed him face down in the back seat.[6]  (Coldren Dep. at 38; Sasso Dep. at 62, 65, 69.)  After he had been put into the police vehicle, several of the officers observed that Bornstad was having some difficulty.  They immediately removed him from the patrol car.  (Sasso Dep. at 71-72; Shappell Dep. at 39.)  Shappell checked Bornstad's vital signs and said that CPR needed to be performed on him.  (Coldren Dep. at 40; Sasso Dep. at 74; Shappell Dep. at 40.)  Knoke began to perform chest compressions, Sasso provided oxygen from a bag mask, Shappell operated an AED machine, and an ambulance was requested.[7]  (Coldren Dep. at 41, 74; Knoke Dep. at 39-40; Sasso Dep. at 75-76.)  Even though Bornstad was handcuffed when the emergency medical procedures were being performed on him, they did not interfere with the emergency measures.  (Knoke Dep. at 39-40; Sasso Dep. at 76.)  When the ambulance arrived, Bornstad's handcuffs were removed.  (Coldren Dep. at 43.)  Bornstad was taken to the emergency room of a local hospital.  He was pronounced dead while at the hospital at 11:35 p.m.  (Hood Dep. Ex. 5.)

---

[5]Sergeant Richard Moran is a police officer with the Parksburg Police Department who arrived approximately when Shappell obtained the cravat.  (Coldren Dep. at 47; Moran Dep. at 4-5; Shappell Dep. at 33.)

[6]At some point before the officers moved Bornstad to the police vehicle in the driveway, Barlow went outside to check on Bornstad's status.  (Barlow Dep. at 23-24.)  She did not hear Bornstad say anything at this point.  (*Id.* at 170-71.)

[7]Barlow testified that she also told the police officers to call for an ambulance.  (Barlow Dep. at 159.)

### B.       Procedural History

Plaintiff filed his initial Complaint in this matter on June 26, 2003.  (Doc. No. 1.)  On

July 22, 2003, Defendants moved to dismiss the Complaint.  (Doc. Nos. 5, 6.)  Defendants'

motions were denied without prejudice and Plaintiff was granted leave to amend the Complaint.

(Doc. No. 14.)  Plaintiff filed the Amended Complaint on December 10, 2003.  (Doc. No. 15.)

On May 26, 2004, we dismissed several of Plaintiff's claims against Defendants.  *Bornstad v.*

*Honey Brook Twp.*, Civ. A. No. 03-CV-3822, 2004 U.S. Dist. LEXIS 9690 (E.D. Pa. May 26,

2004).  Three counts remain:  (1) violations of 42 U.S.C. § 1983;[8] (2) wrongful death; (3) and

survival action.[9]  (*Id.*)  Defendants seek summary judgment on each of these claims.  (Doc. Nos.

42, 43.)

## II.     LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists only when "the

evidence is such that a reasonable jury could return a verdict for the non-moving party."

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

───────────────

[8]Plaintiff alleges that the police officers used excessive force against Bornstad in violation
of the Fourth Amendment and failed to render medical assistance in violation of the Fourteenth
Amendment.  (Pl.'s Trial Mem. at 2.)  Plaintiff also raises a *Monell* claim against West
Brandywine Township and Honey Brook Township for their asserted failure to train police
officers regarding compression asphyxia.  (*Id.* at 2-3.)

[9]Plaintiff's wrongful death and survival actions against the police officers arise from their
asserted assault and battery of Bornstad.  (Pl.'s Trial Mem. at 3-4.)

The party moving for summary judgment bears the initial burden of demonstrating that there are no facts supporting the nonmoving party's legal position. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-24 (1986). Once the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (explaining that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). "The nonmoving party . . . 'cannot rely merely upon bare assertions, conclusory allegations or suspicions' to support its claim." *Townes v. City of Philadelphia*, Civ. A. No. 00-CV-138, 2001 U.S. Dist. LEXIS 6056, at *4 (E.D. Pa. May 11, 2001) (quoting *Fireman's Ins. Co. v. DeFresne*, 676 F.2d 965, 969 (3d Cir. 1982)). Rather, the party opposing summary judgment must go beyond the pleadings and present evidence through affidavits, depositions, or admissions on file to show that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. When deciding a motion for summary judgment, the court must view facts and inferences in the light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995). We do not resolve factual disputes or make credibility determinations. *Siegel Transfer, Inc.*, 54 F.3d at 1127.

## III.   EVIDENTIARY ISSUES

Before addressing the various motions for summary judgment, we must decide certain evidentiary issues raised in the motions in limine.

### A.   Admissibility of Barlow Testimony at Trial

Defendants seek to exclude Barlow's testimony at trial because "[s]he is not mentally competent to testify, cannot clearly recall the events of the incident, and has stated under oath

11

that her statements were inaccurate."  (Doc. No. 58 at 6-7.)  Plaintiff acknowledges that Barlow

may have "personal, emotional and some memory problems."  (Doc. No. 71 at unnumbered 3.)

However, Plaintiff argues that Barlow is competent to testify, and that her testimony is

admissible under the Federal Rules of Evidence.  (Doc. No. 71.)

　　　Under Federal Rule of Evidence 601, every witness is presumed to be competent to

testify.  *United States v. Clemons*, 658 F. Supp. 1116, 1120 (W.D. Pa. 1987); Fed. R. Evid. 601.[10]

A court may only prevent a witness from testifying if the witness does not have personal

knowledge of the matters about which she will testify, she does not have the capacity to recall, or

she does not understand her duty to testify truthfully.  *Clemons*, 658 F. Supp. at 1120 (citing

*United States v. Lightly*, 677 F.2d 1027, 1028 (4th Cir. 1982)); *see also United States v. Odom*,

736 F.2d 104, 112 (4th Cir. 1984) ("Neither feeble-mindedness [nor] insanity renders a witness

incompetent or disqualified.").  While there are few particularized standards governing the

assessment of a person's mental capacity, "[d]iscretion is regularly exercised in favor of allowing

the testimony.  A witness wholly without capacity is difficult to imagine.  The question is one

particularly suited to the jury as one of weight and credibility, subject to judicial authority to

review the sufficiency of the evidence."  Fed. R. Evid. 601 advisory committee's note.  Thus, the

Federal Rules of Evidence "largely convert issues of competency into ones of credibility."

*United States v. Bevans*, 728 F. Supp. 340, 347 (E.D. Pa.), *aff'd*, 914 F.2d 244 (3d Cir. 1990)

(table).

---

[10]Rule 601 provides in pertinent part that "[e]very person is competent to be a witness
except as otherwise provided in these rules."  Fed. R. Evid. 601.  This provision was designed "to
recognize the continuing tendency to disregard common law restrictions on the competency of a
witness in favor of the submission of available evidence to the fact finder for its evaluation."
*Clemons*, 658 F. Supp. at 1120 (citing *United States v. Wilson*, 601 F.2d 95, 98 (3d Cir. 1979)).

In attacking Barlow's competency as a witness, Defendants focus on her inability to accurately recall certain things.[11]  A witness's testimony is admissible if it is

> based on personal knowledge even though the witness is not positive about what he or she perceived, provided the witness had an opportunity to observe and obtained some impressions from his or her observations.  This is true even if the witness admits to having perceptual problems.  A complete disclosure or revelation of the witness's problems will allow the jury to assess the witness's testimony in light of the circumstances.

3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 602.03[2][b] (2d ed. 2000).

In *United States v. Peyro*, 786 F.2d 826 (8th Cir. 1986), the circuit court affirmed the district court's decision to allow certain testimony even though the witness testified

> that she had "some very substantial memory problems" and was "emotionally unbalanced."  She further admitted on cross-examination, with regard to the events she had just recounted to the jury on direct examination:  "I don't remember anything very well.  There are, like, certain moments I know I remember, but nothing at all specific in any of it."

*Id.* at 830 (internal citation omitted).  After examining the witness, the trial court "determined that while [the witness] could not recall detail, 'she has a broad, general recollection.'"  *Id.* at 831.  In affirming the trial court's evidentiary ruling, the *Peyro* court also explained that the testimony likely did not prejudice the defendant's case because the witness's problems "were laid bare for the jury's consideration."  *Id.*

In this case, Barlow has the capacity to recall the chain of events which resulted in Bornstad's death, much of which is corroborated by other evidence.  She testified that Bornstad

---

[11]Defendants do not contend that Barlow lacks personal knowledge regarding the interaction between Bornstad and the police on the evening of June 6, 2002, nor do they suggest that Barlow does not understand her duty to testify truthfully.

13

came home drunk on June 6, 2002, and that he hit her across the face, at which point she tried to

call the police.  (Barlow Dep. at 11-13, 76-77.)  When two police officers arrived at the

residence, Bornstad told them to leave the premises and then "got into a scuffle" with them as the

officers tried to arrest him.  (*Id.* at 14, 17.)  Barlow observed that "Keith started swinging first."

(*Id.* at 37.)  During the subsequent struggle between the two officers and Bornstad in the front

yard, the police used pepper spray in an attempt to subdue Bornstad.  (*Id.* at 20-21.)  While the

two officers were fighting with Bornstad, Barlow called for backup police assistance.  (*Id.* at 84.)

After the backup police officers arrived, they placed Bornstad in a car but then removed him once

the ambulance arrived.  (*Id.* at 24.)  Even though Barlow readily concedes that she has difficulty

reconstructing certain past events, her deposition testimony convinces us that she is competent to

testify at trial.

### B.      Admissibility of Barlow Statement Under Federal Rule of Evidence 803(2)

Defendants seek to exclude statements which were made by Barlow to her friend Angela

Eckert after Bornstad's arrest.  Defendants contend that the statements are inadmissible hearsay.[12]

(Doc. No. 60.)  Plaintiff argues that the contents of a phone conversation between Barlow and

Eckert are admissible under the excited utterance exception to the hearsay rule.  (Doc. No. 72.)

Rule 803(2) provides that a hearsay statement is admissible if it relates "to a startling event or

condition made while the declarant was under the stress of excitement caused by the event or

condition."  Fed. R. Evid. 803(2).  The availability or unavailability of a declarant as a witness

does not affect the applicability of the exception.  *United States v. Brown*, 254 F.3d 454, 458 (3d

---

[12]In reviewing a motion for summary judgment, a court may not consider a hearsay
statement that would be inadmissible at trial.  *Blackburn v. United Parcel Serv.*, 179 F.3d 81, 95
(3d Cir. 1999) (citing *Philbin v. Trans Union Corp.*, 101 F.3d 957, 961 n.1 (3d Cir. 1996)).

Cir. 2001) (citing Fed. R. Evid. 803).  As the Supreme Court explained in *Idaho v. Wright*, 497

U.S. 805 (1990), "such statements are given under circumstances that eliminate the possibility of

fabrication, coaching, or confabulation, and that therefore the circumstances surrounding the

making of the statement provide sufficient assurance that the statement is trustworthy and that

cross-examination would be superfluous."  *Id.* at 820; *see also Brown*, 254 F.3d at 458 (noting

that the underlying rationale for the excited utterance hearsay exception is "that excitement

suspends the declarant's powers of reflection and fabrication, consequently minimizing the

possibility that the utterance will be influenced by self interest and therefore rendered

unreliable").  In order to be admissible under this exception, the proponent of the evidence must

establish the following elements:  (1) a startling event; (2) a statement relating to the

circumstances of that startling event; (3) a declarant who appears to have personally observed the

events; and (4) a statement made before there has been time for the declarant to reflect and

fabricate.  *Brown*, 254 F.3d at 458.

 Here, the requirements of Rule 803(2) are satisfied.  Barlow called Eckert on the evening

of June 6, 2002, after the police had arrested Bornstad.[13]  When Eckert answered the phone, she

initially could not understand what Barlow was saying because she was "screaming and crying."

(Eckert Dep. at 7, 9.)  After approximately two minutes, Eckert was able to calm Barlow so that

she could understand what she was saying.  Barlow told Eckert "that the police were called and

they came and Keith was outside in the front yard and she kept trying to go outside to see what

was going on and they wouldn't let her out the door."  (*Id.*)  She also stated that "she got as far as

---

 [13]Eckert testified that Barlow called her at some point between 10:30 p.m. and 11:30 p.m. and that the phone call lasted approximately seven minutes.  (Eckert Dep. at 8-9.)

standing at the front door and . . . Keith was out in the front yard yelling Lorraine, help me,

Lorraine, help me, I can't breathe, I think I'm having a heart attack, get them off of me."  (*Id.* at

7-8.)  Barlow told Eckert that Bornstad "kept repeating that over and over and over again, help

me, and then she didn't hear anything else from him."  (*Id.* at 8.)  Eckert testified that Barlow

"kept saying I know he is dead, I know he is dead, he couldn't breathe."  (*Id.*)

These statements are admissible under Rule 803(2).  The interaction between Bornstad

and the police, which ended with Bornstad being placed in an ambulance, constitutes a startling

event.  "The test should not be whether the judge considers the matter routine and unexciting, but

whether the declarant probably did."  5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's*

*Federal Evidence* § 803.04[2] (2d ed. 2000).  Here, Barlow was hysterical when she called

Eckert.  Further, the contents of the phone conversation were directly related to the circumstances

of the startling event.  Barlow also appears to have personally witnessed the interaction between

Bornstad and the police.

Finally, Barlow's statements were made before she had time to reflect and prevaricate.

The declarant's statement need not be contemporaneous with the startling event in order to be

admissible as an excited utterance.  *Brown*, 254 F.3d at 460.  Rather, Rule 803(2) only requires

that the statement be contemporaneous with the excitement caused by the event.  *Id.*; *see also*

*United States v. Tocco*, 135 F.3d 116, 127-28 (2d Cir. 1998) (explaining that declarant's

statement, which was made three hours after the startling event, was admissible because the

declarant's excitement had not subsided when he made the statement); *United States v. Scarpa*,

913 F.2d 993, 1017 (2d Cir. 1990) (holding that excited utterance exception applied to statement

made between five and six hours after the startling event because the declarant "was still under

16

the stress of excitement"); Fed. R. Evid. 803 advisory committee's note.  Barlow was upset and

distraught when she called Eckert, and could provide intelligible information to Eckert only after

Eckert sought to calm her.  Under the circumstances, the excited utterance hearsay exception

applies to the statements made by Barlow during her telephone conversation with Eckert.

   C.   **Admissibility of Certain Expert Testimony**

Each party contends that certain expert testimony should be excluded pursuant to Federal

Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as an
> expert by knowledge, skill, experience, training, or education, may testify thereto
> in the form of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods reliably to the
> facts of the case.

Fed. R. Evid. 702.  "Rule 702 embodies a trilogy of restrictions on expert testimony:

qualification, reliability and fit."  *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).

In making a determination as to whether an expert is qualified to give testimony, Rule

702 requires that the witness have specialized knowledge regarding the proffered area of

testimony.  *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000).  An expert witness must, at

a minimum, "'possess skill or knowledge greater than the average layman." *Id.* (quoting *Waldorf

v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998)).  The Third Circuit interprets this qualifications

requirement liberally, providing "that 'a broad range of knowledge, skills, and training qualify an

expert.'"  *Schneider*, 320 F.3d at 404 (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717,

741 (3d Cir. 1994)); *see also In re TMI Litig.*, 193 F.3d 613, 664 (3d Cir. 1999) (citing *In re*

17

*Paoli*, 35 F.3d at 749-50); *Holbrook v. Lykes Bros. Steamship Co.*, 80 F.3d 777, 782 (3d Cir. 1996) (holding that "it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate").

Once this threshold inquiry is satisfied, the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony . . . rests on a reliable foundation." *Daubert*, 509 U.S. at 597; *see also United States v. Mitchell*, 365 F.3d 215, 234 (3d Cir. 2004); *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000).[14]  In assessing the "reliability" of the testimony, a court should consider:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subjected to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology;[15] and (8) the non-judicial uses to which the method has been put.[16]

---

[14]*Daubert's* general principles apply to both scientific expertise and technical knowledge. *Mitchell*, 365 F.3d at 234 (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999)); *see also Kumho Tire Co.*, 526 U.S. at 141 ("*Daubert's* general holding – setting forth the trial judge's general 'gatekeeping' obligation – applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge.").

[15]Under Rule 702, the issue of whether an expert is qualified is analytically distinct "from the more finely textured question whether a given expert's qualifications enhance the reliability of his testimony." *Mitchell*, 365 F.3d at 242.

[16]In making this reliability assessment, a court is not required to conduct a *Daubert* hearing.  *Oddi*, 234 F.3d at 154 (citing *United States v. Downing*, 753 F.2d 1224, 1241 (3d Cir. 1985)).

*Oddi*, 234 F.3d at 145 (citing *In re Paoli*, 35 F.3d at 742 n.8).  A court has the discretion to consider other additional factors and to determine whether all of the designated factors must be considered in every case.  *Elcock*, 233 F.3d at 746.

Finally, to be admissible under Rule 702, the expert's testimony must also be relevant and be found to assist the trier of fact.  *Daubert*, 509 U.S. at 587-88, 595*; Schneider*, 320 F.3d at 404; *In re Paoli*, 35 F.3d at 743.  "Admissibility thus depends in part upon 'the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case.'  This standard is not intended to be a high one . . . ." *Oddi*, 234 F.3d at 145.  Federal Rule of Evidence 402 provides that all relevant evidence generally is admissible.  Fed. R. Evid. 402.  The Federal Rules of Evidence define relevance as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.

### 1.      Ian C. Hood, M.B., Ch.B., J.D.

Ian C. Hood, M.B., Ch.B., J.D. is the Deputy Medical Examiner for Philadelphia.  As a forensic pathologist, Hood seeks to determine what factors contributed to a person's death.[17] (Hood Dep. at 33.)  On June 7, 2002, Hood conducted an autopsy of Bornstad.[18]  (*Id.* Ex. 5.)  Defendants seek to exclude the expert testimony of Hood as being unreliable.  (Doc. No. 61 at 8.)

---

[17]Defendants do not challenge the sufficiency of Hood's qualifications as an expert. Hood's experience as a forensic pathologist is extensive.  He has performed more than 15,000 autopsies during his professional career, and has lectured and written extensively about forensic pathology.  (Hood Dep. at 5, 7, 29, Ex. 1.)

[18]Hood conducted the autopsy at the request of the Chester County coroner's office and acted as a coroner's pathologist.  (Hood Dep. at 39.)  The purpose of the resulting autopsy report was to document the pathologist's findings and "to permit the coroner to arrive at a determination for issuing a Death Certificate for the individual."  (*Id.* at 115.)

Plaintiff seeks to rely on Hood's expert testimony to establish that Bornstad died primarily as a result of compression asphyxia.[19]

Hood's external examination of Bornstad revealed that he had petechiae of the eyelids.[20] (Hood Dep. at 123.)  According to Hood, petechiae are sometimes present when an individual dies from compression asphyxia.[21]  (*Id.*)  During the internal examination, Hood discovered that Bornstad's brain appeared dusky.  A dusky brain, which has a plum purple gray color, is a brain that has been deprived of oxygen.  This "is entirely consistent with asphyxia."  (*Id.* at 50, 54.) Hood explained that "the only way I can diagnose asphyxia at autopsy is by that very plum-purple, dusky-looking brain."[22]  (*Id.* at 177; *see also* Doc. No. 96 Ex. D.)  Bornstad also had some coronary artery disease.  (Hood Dep. at 47, 50, Ex. 5.)  In addition, Hood received

---

[19]A person may die from asphyxia as a result of chest compression.  Spitz and Fisher, *Medicological Investigation of Death* 444 (3d ed. 1993) (Doc. No. 61 Ex. D).  This text explains that

> Homicide by compression of the chest, as by kneeling or sitting on the back of a victim, is rare.  Such deaths have occurred in the course of police arrests, during attempts to handcuff a violent prisoner, facedown on the floor or the back seat of a police cruiser.  Forcing the arms backward, while the chest is pushed forward by the weight of the officer, may lead to immobilization of the chest and death, especially if the prisoner is agitated or under the depressing effect of alcohol or drugs.

*Id.* at 484.

[20]Petechiae are little hemorrhages that can be observed in fine skin.  (Hood Dep. at 36.)

[21]Hood has written about the relationship between petechiae and compression asphyxia. (Hood Dep. at 36.)

[22]Hood testified that, in every autopsy he has been involved with which revealed a plum-colored brain, asphyxia in some form was involved in the person's death.  (Hood Dep. at 101.) Rodger Rothenberger, M.D., the Chester County Coroner, agreed with Hood's assessment that a dusky brain is evidence of compression asphyxia.  (Rothenberger Dep. at 96.)

information about the circumstances surrounding Bornstad's arrest from both the Chester County

detectives who conducted witness interviews and a field investigator at the coroner's office.  (*Id.*

at 71, 80, 133, 141.)  Based on all of this information, Hood ruled out various causes of death and

concluded in his June 10, 2002, autopsy report that Bornstad's primary cause of death was

compression asphyxia.  (*Id.* Ex. 5.)  He concluded that this asphyxia, combined with Bornstad's

arteriosclerotic coronary vascular disease, led to his death.[23]  (*Id.* at 58, 62, 92.)

In reviewing the record, we conclude that Hood's expert testimony regarding

compression asphyxia rests on a reliable foundation.  Hood compiled information about

Bornstad's death from several sources, including witness interviews and his own competent

autopsy of Bornstad.  Applying his extensive background knowledge of forensic pathology

generally and asphyxia specifically, he reviewed all of this information and concluded that

compression asphyxia was a significant contributing factor in Bornstad's death.  We understand

that several forensic pathologists may review the same data regarding a person's death and arrive

at different conclusions regarding the cause of that death.  In fact, in this case Defendants'

experts have reviewed many of the same materials on which Hood relied but arrived at different

conclusions.  Such disagreements, however, do not make Hood's own methods unreliable.  We

are satisfied that Hood's methodology in determining Bornstad's cause of death is sound.

### 2.    Rodger Rothenberger, M.D.

Rodger Rothenberger, M.D., a licensed physician, has been the Chester County Coroner

since 1998.  (Doc. No. 88 Ex. A.)  As the coroner, Rothenberger is responsible for investigating

---

[23]Hood did not review Bornstad's histology before completing his first written report.
(Hood Dep. at 57.)  On May 18, 2004, Hood issued an amended report that included the
histology, which "confirmed the coronary artery disease and the acute anoxia in the brain."  (*Id.*)

violent, suspicious, and traumatic deaths to determine the cause and manner of those deaths.
(Rothenberger Dep. at 6-7.)  Defendants seek to exclude the expert testimony of Rothenberger,
arguing that he is not sufficiently qualified to testify that Bornstad died as a result of compression
asphyxia.[24]  (Doc. No. 64 at 3.)  Plaintiff avers that Rothenberger is qualified to testify about the
investigation of a serious death case, the results of his investigation into Bornstad's death, and
Bornstad's cause of death.  (Doc. No. 88 at 6.)

Rothenberger is sufficiently qualified to testify as an expert about his conclusion that
Bornstad died from compression asphyxia.  He is familiar with compression asphyxia as a cause
of death, and has trained staff members of the coroner's office about its occurrence.
(Rothenberger Dep. at 10-11, 58.)  Based on his background knowledge of compression
asphyxia, as well various sources of information regarding Bornstad's death, Rothenberger
completed the final death certificate for Bornstad and detailed the immediate cause of death as
compression asphyxia.[25]  (Id. at 11; Hood Dep. Ex. 7.)  He relied on the autopsy findings, which
were consistent with a diagnosis of compression asphyxia.  (Rothenberger Dep. at 72, 83.)
Rothenberger also relied on the results of Bornstad's toxicology tests, which purportedly revealed
that alcohol was present in Bornstad's system but that no other medications or illegal drugs were

---

[24]Defendants also assert that Rothenberger's expert testimony should be excluded because
he relies on "the flawed and inadmissible analysis of Dr. Hood."  (Doc. No. 64 at 1.)  Because
Hood's expert testimony is admissible, we will not exclude Rothenberger's testimony on this
ground.

[25]Bornstad also suffered from coronary vascular disease.  However, Rothenberger
concluded that "[t]he degree of it would not usually cause sudden death," and that it did not
contribute to Bornstad's death.  (Rothenberger Dep. at 109.)

present in his system.[26]  (*Id.* at 29.)  He also relied on interviews conducted by both himself and a

field investigator for the Chester County Coroner's Office regarding the circumstances of

Bornstad's death, as well as information provided to him by the district attorney's office.  (*Id.* at

8-9, 37-40, 51-52, 85.)  Rothenberger testified that all of these facts led him to the conclusion

that Bornstad died from compression asphyxia:

> The most concrete facts are the actual findings consistent with asphyxia at the time
> of the autopsy.  The rest of the conclusion as far as how that happened, making a
> compression asphyxia, was the historical recollection of events and the otherwise
> negative toxicology for any other drugs or prescription or cocaine drugs being
> present in his system.[27]

(*Id.* at 67.)  Given the Third Circuit's interpretation of Rule 702's qualifications requirement,

Rothenberger is certainly qualified to testify about why he concluded that Bornstad died from

compression asphyxia.[28]

---

[26]As a result of this toxicology report, Rothenberger considered and rejected the use of cocaine as a cause or partial cause of Bornstad's death after reviewing the toxicology results. (Rothenberger Dep. at 31.)

[27]Because Rothenberger and Hood did not rely on precisely the same information in concluding that Bornstad died from compression asphyxia, Rothenberger's testimony is not cumulative under Federal Rule of Evidence 403.

[28]Defendants' concerns relate to the weight to be accorded Rothenberger's testimony, rather than to its admissibility.  Under the Federal Rules of Evidence and *Daubert*, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see also Mitchell*, 365 F.3d at 244-45 ("Rule 702 and *Daubert* put their faith in an adversary system designed to expose flawed expertise."); *Stecyk v. United States*, 295 F.3d 408, 414 (3d Cir. 2002) (finding that Federal Rules of Evidence 703 and 705 place "the burden of exploring the facts and assumptions underlying the testimony of an expert witness on opposing counsel during cross-examination").

          3.        G. John DiGregorio, M.D., Ph.D.

     After Bornstad died, the Chester County Coronor's Office asked Analytic Bio-

Chemistries, Inc. ("Analytic Bio-Chemistries") to perform various toxicology tests.  After

analyzing Bornstad's urine, the laboratory reported only the presence of alcohol in Bornstad's

system.  Defendants proffer the testimony of G. John DiGregorio, M.D., Ph.D., who concludes

that Bornstad had cocaine in his system when he died.  Plaintiff seeks to exclude the expert

testimony of DiGregorio as being unreliable.[29]  (Doc. No. 84 at 1.)

     The parties' dueling experts disagree about whether the laboratory conducted appropriate

tests to determine which substances were present in Bornstad's system when he died.  Theodore

J. Siek, Ph.D., of Analytic Bio-Chemistries performed two separate toxicological tests.  First, he

conducted a flourescence polarization immunoassay ("FPIA") test, which is designed to detect

cocaine metabolite.[30]  (DiGregorio Dep. at 24; Siek Dep. at 11.)  This test reported that there

were 14.91 ng/mL units of "[c]ocaine" in Bornstad's urine.[31]  (Doc. No. 84 Ex. A.)  Siek then

performed a thin-layer chromatography confirmatory test, which detects both cocaine and its

_____

     [29]Plaintiff does not challenge the sufficiency of DiGregorio's qualifications as an expert.
DiGregorio is medical director for National Medical Services, a facility which tests for drugs in
blood and urine.  (DiGregorio Dep. at 4-5.)  As medical director, DiGregorio evaluates
"laboratory results as it pertains to a clinical implication or a forensic case."  (*Id.*)

     [30]Cocaine and cocaine metabolite are separate substances.  The presence of cocaine
indicates whether a person is actively taking cocaine, while the presence of cocaine metabolite,
which is what the body produces when it breaks down cocaine, shows whether a person had
taken cocaine in the past.  (DiGregorio Dep. at 13; Siek Dep. at 34-35.)

     [31]Even though the FPIA shows the presence of "[c]ocaine," Siek argues that the 14.91
ng/mL figure refers to the cocaine metabolite.  (Siek Dep. at 29.)  Regardless, he also states that
the figure is simply background noise and not a valid reading.  (*Id.* at 11.)  DiGregorio disagrees,
stating that Siek's report dealt with cocaine, and not its metabolite.  (DiGregorio Dep. at 72.)

metabolite.  (Siek Dep. at 22.)  This test reported that neither substance was present in Bornstad's urine.  (*Id.*)

DiGregorio asserts that Siek made several mistakes when he tested for the presence of cocaine and its metabolite.  He argues that Siek should not have used the second, confirmatory test because it is less accurate than the FPIA test.  (DiGregorio Dep. at 76.)  Instead, the laboratory should have conducted a Gas Chromatography/Mass Spectrometry ("GCMS") test of Bornstad's blood.[32]  (*Id.* at 74.)  According to DiGregorio, a blood test should have been conducted because, unlike a urine analysis, it shows what was in an individual's system at the time of death.  (*Id.* at 23-24.)  Siek readily acknowledges that GCMS is more sensitive than the FPIA or thin-layer tests in detecting cocaine and its metabolite.  However, he did not conduct this analysis because both urine tests were negative for cocaine and its metabolite.  (Siek Dep. at 27, 49.)

We will permit DiGregorio to testify concerning the presence of cocaine in Bornstad's system when he died.  Even though Siek contends that the 14.91 ng/mL cocaine figure from the FPIA test is background noise, DiGregorio notes that there were some substances, such as barbiturates and opiates, which were reported as 0.00 ng/mL.  (DiGregorio Dep. at 14.) However, this is only one of the factors which led DiGregorio to conclude that Bornstad died from cardiac arrhythmia associated with cocaine.  (*Id.* at 31-32, 52, 65.)  Other factors, such as Bornstad's behavior at the time of his arrest and the high incidence of cardiac arrhythmia among those with cocaine in their system who are restrained by the police, also suggested to DiGregorio

---

[32]DiGregorio explained that "urine is not the generalized accepted media to determine whether a person is impaired."  (DiGregorio Dep. at 23.)

that Bornstad had cocaine in his system when he was arrested.  (*Id.* at 31-32, 65.)  DiGregorio

testified that "[i]f you take all the pieces together, I'm certain that the person was under

cocaine."[33]  (*Id.* at 33.)  DiGregorio's opinions regarding the presence of cocaine in Bornstad's

system rest on a reliable foundation and are admissible.

## IV.   LEGAL ANALYSIS

### A.   42 U.S.C. § 1983

Plaintiff brings a claim against all Defendants under 42 U.S.C. § 1983, which provides in

pertinent part that:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia, subjects, or causes to
> be subjected, any citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action at law, suit in
> equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983 (2000).  Section 1983 does not create substantive rights.  *Doe v. Delie*, 257

F.3d 309, 314 (3d Cir. 2001).  Rather, it provides a remedy "for any person who has been

deprived of rights secured by the Constitution or laws of the United States by a person acting

under color of law."  *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002) (citing *Gruenke v. Seip*,

225 F.3d 290, 298 (3d Cir. 2000)); *see also Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).

A plaintiff must prove an underlying statutory or constitutional violation in order to prevail under

42 U.S.C. § 1983.  *See, e.g., Daniels v. Williams*, 474 U.S. 327, 330 (1986) (holding that in order

---

[33]Hood also reviewed Bornstad's toxicology results, which seemed to reveal that he had
only alcohol in his system.  (Hood Dep. at 58-59, 109.)  This result "surprised" Hood.  (*Id.* at 58-
59.)  Based on Bornstad's behavior, Hood expected the report to show the presence of a
stimulant such as cocaine in Bornstad's system when he died.  (*Id.* at 59.)

to recover in a § 1983 suit, a "plaintiff must still prove a violation of the underlying
constitutional right"); *Doe*, 257 F.3d at 314.

1.    <u>§ 1983 Claim Against Police Officer Defendants</u>

In approaching the merits of a § 1983 claim, a court begins by identifying "the exact
contours of the underlying right said to have been violated" and then determining "whether the
plaintiff has alleged a deprivation of a constitutional right at all." *Nicini v. Morra*, 212 F.3d 798,
806 (3d Cir. 2000) (internal quotation omitted).  Plaintiff alleges that the police officer
Defendants violated 42 U.S.C. § 1983 by using excessive force against Bornstad in violation of
the Fourth Amendment.  (Pl.'s Trial Mem. at 2.)  The Fourth Amendment prohibits the use of
excessive force during the course of an arrest.  *Graham v. Connor*, 490 U.S. 386, 395 (1989);
*Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995).  Plaintiff also avers that these
Defendants violated § 1983 by failing to render medical assistance when Bornstad was placed
under arrest.  (Pl.'s Trial Mem. at 2.)  The due process clause of the Fourteenth Amendment
requires that a police officer provide medical care to an individual who was injured during the
course of an arrest.  *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).  Thus,
Plaintiff alleges two underlying constitutional violations against the Defendant police officers:
(1) using excessive force to effect an arrest; and (2) failing to render medical assistance.

Each police officer Defendant seeks to invoke the doctrine of qualified immunity.  (Doc.
No. 42 at unnumbered 17; Doc. No. 43 at 7.)  Qualified immunity is "an entitlement not to stand
trial or face the other burdens of litigation."  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).
Under this doctrine, "officers performing discretionary functions are 'shielded from liability for
civil damages insofar as their conduct does not violate clearly established statutory or

27

constitutional rights of which a reasonable person would have known.'"  *Curley*, 298 F.3d at 277

(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  It is preferable for a court to

determine whether an official's conduct is subject to qualified immunity at the summary

judgment stage of a proceeding.  *Carswell v. Borough of Homestead*, 381 F.3d 235, 241 (3d Cir.

2004).

       In reviewing the merits of a claim of qualified immunity, a court must conduct a multi-

step inquiry.  First, it must determine whether "the facts alleged show the officer's conduct

violated a constitutional right."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Hope v.

Pelzer*, 536 U.S. 730, 736 (2002); *Donahue v. Gavin*, 280 F.3d 371, 378 (3d Cir. 2002)

(explaining that a court "must 'determine first whether the plaintiff has alleged a deprivation of a

constitutional right at all' when a government official raises qualified immunity as a defense to

an action under § 1983" (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 842 n.5

(1998))).  If the facts, when viewed in the light most favorable to the plaintiff, do not show that

the officer violated a constitutional right, then plaintiff's § 1983 claim fails.  *Curley*, 298 F.3d at

277.

       Once a court determines that there is sufficient evidence to conclude that the officer did

commit a constitutional violation, it must assess whether the right was clearly established at the

time he acted.  *Saucier*, 535 U.S. at 201; *Curley*, 298 F.3d at 277; *Mellott v. Heemer*, 161 F.3d

117, 121 (3d Cir. 1998).  "'Clearly established' for purposes of qualified immunity means that

'the contours of the right must be sufficiently clear that a reasonable official would understand

that what he is doing violates that right.'"  *Wilson v. Layne*, 526 U.S. 603, 614-15 (1999)

(quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  In reviewing whether an officer's

conduct violated a clearly established right, a court must determine "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."[34] *Saucier*, 535 U.S. at 201 (citing *Wilson*, 526 U.S. at 615); *see also Sterling v. Borough of Minersville*, 232 F.3d 190, 193 (3d Cir. 2000).  As the Supreme Court explained in *Anderson*:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has been previously held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson*, 483 U.S. at 639.  Summary judgment is proper if no reasonable factfinder could conclude that the Defendant police officers violated Bornstad's clearly established rights.  *Wilson v. Russo*, 212 F.3d 781, 786 (3d Cir. 2000).  If an officer violated a clearly established constitutional right, then he may not rely on the defense of qualified immunity.  *Curley*, 298 F.3d at 277.

In *Saucier*, the Supreme Court observed that a court must conduct this additional level of analysis to determine whether an officer's conduct is subject to qualified immunity:

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct.  It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.  An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances.  If the

---

[34]When a plaintiff alleges that an officer exerted excessive force against him, the doctrine of qualified immunity acts "to protect officers from the sometimes hazy border between excessive and acceptable force and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful."  *Saucier*, 533 U.S. at 206 (internal quotation omitted); *see also id.* at 202 ("If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate.").

officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the qualified immunity defense.

*Saucier*, 533 U.S. at 205.  If an official did violate a clearly established constitutional right, the court must then decide "whether the officer made a reasonable mistake as to what the law requires."  *Carswell*, 381 F.3d at 242.  The determinations of whether the right was clearly established and whether the official's conduct was reasonable are questions of law.  *Sterling*, 232 F.3d at 193.

> a.      Qualified Immunity As Applied To The Excessive Force Claim

Plaintiff asserts that the police officer Defendants used excessive force against Bornstad when they arrested him on June 6, 2002, in violation of the Fourth Amendment to the United States Constitution.  "In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force."  *Graham*, 490 U.S. at 394.  When the alleged violation arises from an arrest, the Fourth Amendment is implicated.  *Id.* at 395; *see also Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999) (noting that "excessive force in the course of an arrest is properly analyzed under the Fourth Amendment, not under substantive due process" (citing *Graham*, 490 U.S. at 393-94)).

> i.      Defendant Police Officers Did Not Use Excessive Force

To prevail on an excessive force theory under the Fourth Amendment, a plaintiff must show that there was a seizure and that the use of force "is excessive under objective standards of reasonableness."  *Saucier*, 533 U.S. at 201-02; *see also Curley*, 298 F.3d at 279 (citing *Abraham*, 183 F.3d at 288).  "A seizure occurs 'whenever an officer restrains the freedom of a person to

walk away.'"  *Curley*, 298 F.3d at 279 (quoting *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)).

Here, the police officers restrained Bornstad's freedom when they placed him under arrest.  *See*

*Atwater v. City of Lago Vista*, 532 U.S. 318, 363 (2001) (recognizing that a full custodial arrest

falls "within the ambit of the Fourth Amendment").

       In reviewing whether a seizure was unreasonable, a court must determine whether the

officer's "actions were objectively reasonable in light of the facts and circumstances confronting

him, regardless of his underlying intent or motivation."  *Curley*, 298 F.3d at 279 (internal

quotations omitted); *see also Graham*, 490 U.S. at 396 (noting that a court must conduct its

inquiry "from the perspective of a reasonable officer on the scene, rather than with the 20/20

vision of hindsight").  The amount of permissible force that may be used to effectuate an arrest is

based on the totality of the circumstances.  *Graham*, 490 U.S. at 396.  In this context, "'totality'

is an encompassing word.  It implies that reasonableness should be sensitive to all of the factors

bearing on the officer's use of force."  *Abraham*, 183 F.3d at 291.  In reviewing the totality of the

circumstances, a court should consider "whether the suspect posed an immediate threat to the

safety of the officer or others, whether the suspect was actively resisting arrest, and the severity

of the crime at issue."  *Curley*, 298 F.3d at 279 (citing *Abraham*, 183 F.3d at 289).

       In this case, the actions of the Defendant police officers were objectively reasonable

given the facts and circumstances confronting them.  When Baxter and Sasso arrived at

Bornstad's residence, Bornstad answered the door.  Sasso told him that they were responding to a

911 hang-up, which was not answered when the county dispatch tried to return the call.  When

Bornstad said that there was no problem, Barlow then walked up behind Bornstad and

commented that Bornstad "was going to lie like he usually does to keep from getting in trouble." Sasso noticed that Barlow was upset and that she had been crying.

Sasso instructed Bornstad to exit the residence and then went inside to talk to Barlow.  As Sasso walked past Bornstad to enter the house, he smelled alcohol.[35]  Barlow told Sasso that Bornstad returned to the residence after he had been drinking and that he was agitated.  She told Sasso that after they began to argue, Bornstad hit Barlow in the face.  Sasso testified that Barlow "continued to tell me that she was extremely concerned because she had just had surgery on her neck and she felt that she could no longer take this type of abuse."  Barlow said "that it was a common occurrence that he would come home intoxicated and abuse her."[36]  She also told Sasso that Bornstad bit her daughter on her back.  Sasso observed a bite mark "in the center of her back between her shoulder blades."

The officer then spoke with Barlow's daughter, who said that "she was in her bedroom sitting on the bed playing a game on the computer, Mr. Bornstad came in and told her to turn the game off and she said for some reason he snuck around behind her and got onto the bed and that's when she was bit in the center of the back."  The daughter also told Sasso that Bornstad bit her on her right cheek.  Sasso noted that Barlow's daughter's right cheek was red.

---

[35]Baxter also smelled "a strong odor" of alcohol on Bornstad's breath.  (Baxter Dep. at 51.)  At the time of his death, Bornstad had a blood alcohol content of .09.  (Hood Dep. at 58-59.)  Defendants contend that he also had cocaine in his system.  This level of alcohol would have affected Bornstad's judgment, coordination, and reaction time.  (*Id.* at 59.)  Hood explained that "[h]ad he not been drunk, hopefully, he would have been a bit more rational and realized that it was unwise to fight with increasing numbers of burly police officers that were arriving on site." (*Id.* at 62.)

[36]Barlow had obtained a protection from abuse order against Bornstad, which had expired.  In addition, she had previously requested police assistance when Bornstad "got brutal." (Barlow Dep. at 30-31.)

After talking to Barlow's daughter, Sasso exited the residence and advised Bornstad that he was under arrest.  Plaintiff concedes that "[t]here was sufficient probable cause to arrest Mr. Bornstad."  (Doc. No. 48 at 5.)  Sasso asked Bornstad to turn around and to place his hands behind his back.  When Bornstad did not comply, Sasso told him not to resist arrest as the officers tried to grab his arms.  At this point all hell broke loose.  Bornstad hit Baxter in the chest with closed fists and knocked him down on the porch.  He also struck Sasso in the chest with his fist.[37]  When Bornstad hit the officers, he was clearly illegally resisting arrest.[38]  "Once the police officer informs the arrestee that he is under arrest, anything short of complete acquiescence and cooperation could reasonably be believed by the police officer as a form of resistance."  *Pasqualino v. City of Philadelphia*, Civ. A. No. 96-6363, 1998 U.S. Dist. LEXIS 8627, at *16-17 (E.D. Pa. June 9, 1998); *see also United States v. Montoya de Hernandez*, 473 U.S. 531, 542 (1985) ("Authorities must be allowed to graduate their response to the demands of any particular situation." (internal quotation omitted)).[39]  Under the circumstances, the officers were required to use such force as was necessary to effect the arrest.

At this point, the melee between Bornstad and the officers began in earnest.  After Baxter got back on his feet, both officers again tried to grab Bornstad's arms, at which point Bornstad broke free and began to swing both arms.  As Bornstad was "flailing" his arms, he was yelling profanities at the officers.  Bornstad hit Sasso in the chest and all three individuals fell on the

---

[37]Bornstad was six feet, one inch tall and weighed 230 pounds.  (Hood Dep. Ex. 5.)

[38]Under Pennsylvania law, a person may not "resist an arrest which the actor knows is being made by a peace officer," even if the arrest is unlawful.  18 Pa. Cons. Stat. § 505(b)(1)(i).

[39]In fact, Plaintiff concedes that "Mr. Bornstad resisted arrest."  (Doc. No. 48 at 5.)

front porch.  Bornstad then literally picked both of the officers up off of the ground.  Baxter and

Sasso told Bornstad to stop resisting and to stop fighting, but Bornstad continued to use

profanities, continued to swing his arms, and continued to fight with the officers.  Baxter and

Sasso again tried to grab his arms, at which point they all fell, landing in the flower bed.  Baxter

was so concerned about his welfare and the welfare of Sasso that he called for backup assistance.

Even when Bornstad was on his back on the ground he continued to swing, hitting Sasso

several times.  Sasso sprayed pepper spray into Bornstad's face, but this had no effect on him.

The officers continued to command Bornstad to stop resisting and fighting and to put his hands

behind his back, but every time they commanded him to stop, Bornstad would yell "f--- you" and

continue fighting.  The officers tried to control Bornstad's arms as he was lying on his back on

the ground but he continued to struggle.  As the struggle moved to the front yard, Barlow came

out of the house and began to yell at Bornstad.  At this point, both officers told her to call 911

and request backup police officers, which she did.

When Sasso and Baxter tried to put handcuffs on Bornstad, Bornstad grabbed Baxter by

the throat and began to choke him.  Sasso pepper sprayed Bornstad in his face but this had no

effect on him as he continued to choke Baxter.  Eventually, the officers were able to break

Bornstad's grip and handcuff his hands in front of his body.  This did not stop Bornstad from

attempting to kick the officers.

Even after the backup officers arrived and even though Bornstad's hands were

handcuffed, Bornstad continued to fight.  When the officers attempted to handcuff Bornstad's

hands behind his back for his safety and for their own safety, Bornstad broke one hand free and

hit one of the officers.  When the officers finally got Bornstad's hands handcuffed behind his

back, he attempted to kick the officers.  The officers were required to tie Bornstad's legs together to avoid being kicked by him.  Finally the officers were able to carry Bornstad to the police car and put him in the back seat.  It was at this time that they observed that he was in some medical distress.  Emergency medical care was immediately rendered.  We are satisfied that all of the Defendant officers used an appropriate amount of force in attempting to restrain Bornstad.

There is a dispute regarding whether Bornstad made any statements about his health while the officers tried to restrain him.  Barlow testified that Bornstad "was yelling out" to Barlow for help during his struggle with these officers, and that he "was saying he was having trouble breathing.  He was saying to try to get the police off of his chest."  When Baxter and Sasso were trying to restrain Bornstad by themselves, Barlow explained that "[h]e always had a complaint about his breathing. . . .  He was yelling that he was feeling pressure on his chest and was having a hard time breathing."  While Bornstad was on the ground, Barlow said that Bornstad also complained that he was having a heart attack.  Baxter, however, testified that Bornstad never expressed any complaints about his health.  Sasso also testified that Bornstad never said that he was having breathing problems, that he was having a heart attack, or that he was dying, and that he never complained about any medical problems.

Plaintiff argues that this conflicting evidence, coupled with the testimony regarding the officers' being on top of Bornstad, the officers' four-point restraint of Bornstad's extremities, and their repeated use of pepper spray, constitute genuine issues of material fact as to whether the officers' conduct caused Bornstad to die from compression asphyxia.[40]  For purposes of this

---

[40]Plaintiff's theory is that Bornstad died from compression asphyxia, as opposed to positional asphyxia.  (Doc. Nos. 47 at 25, 48 at 24 ("It is important for the Court to realize that this is not a positional asphyxia case.").)

discussion, we will assume that the conduct of the Defendant officers inhibited Bornstad's ability to breathe and contributed to his death.[41]  This assumption does not alter the conclusion that the officers acted reasonably in attempting to subdue Bornstad.  When the officers tried to arrest Bornstad, he actively and violently resisted them.  Bornstad posed an immediate threat to the officers as he continued to fight with them.  Faced with an individual who wanted to engage in a brawl rather than be arrested, the officers acted reasonably, even assuming that they were on top of Bornstad, that they restrained his extremities, and that they used pepper spray.[42]  Even after the officers repeatedly instructed Bornstad to stop fighting, he continued to resist arrest, kicking and screaming at them during the struggle.[43]  "Restraining a person in a prone position is not, in and of itself, excessive force when the person restrained is resisting arrest."  *Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997).  The officers had no reasonable alternatives in dealing with Bornstad other than trying to restrain him.  It was Bornstad, after all, who began his unabated physical attack on Baxter and Sasso and then continued to fight even after the backup officers arrived.[44]  Confronted with an individual who was out of control, and who was refusing

---

[41]While the use of a four-point restraint is not the most common cause of compression asphyxia, it can result in such asphyxia.  (Hood Dep. at 79-80.)

[42]Hood testified that the use of pepper spray on a person who, like Bornstad, is not allergic to it "should have no influence at all on their death, other than it's another stressing factor which is going to make [a person's] oxygen requirement greater."  (Hood Dep. at 78.)  Thus, it is reasonable to expect that an individual on whom pepper spray is used would complain about an inability to breathe.

[43]An individual can continue to vocalize even while his chest is being compressed.  (Hood Dep. at 67.)

[44]Plaintiff primarily relies on three federal court of appeals decisions to argue that "a court can declare [that] a Constitutional violation for excessive force obviously occurs where compression asphyxia occurs."  (Doc. Nos. 47 at 33, 48 at 23.)  In *Champion v. Outlook*

to be arrested, none of the officers drew their weapons or physically retaliated against Bornstad.

*Tofano v. Reidel*, 61 F. Supp. 2d 289, 303 (D.N.J. 1999).  Rather, when Bornstad refused to comply with any of the officers' requests, the officers acted reasonably in attempting to restrain him.  We are satisfied that the force used by the officers was reasonable and necessary.  It was not excessive force.  The Fourth Amendment was not violated.[45]

––––––––––––––––––––

*Nashville, Inc.*, 380 F.3d 893 (6th Cir. 2004), the Sixth Circuit declined to grant qualified immunity to the arresting officers.  The court recognized that it is clearly established "that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position *after being subdued and/or incapacitated* constitutes excessive force."  *Id.* at 903 (emphasis added).  There, the suspect was "a mentally retarded individual who had stopped resisting arrest and posed no flight risk."  *Id.* at 901.

The Ninth Circuit held that the officers who arrested the plaintiff were not entitled to qualified immunity in *Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003).  The court explained that immunity was not available because "kneeling on the back and neck of a compliant detainee, and pressing the weight of two officers' bodies on him even after he complained that he was choking and in need of air violates clearly established law" and "reasonable officers would have been aware that such was the case."  *Id.* at 1062.  There, the plaintiff "was a mentally disturbed individual not wanted for any crime, who was being taken into custody to prevent injury to himself."  *Id.* at 1059.

In *Simpson v. Hines*, 903 F.2d 400 (5th Cir. 1990), the Fifth Circuit held that qualified immunity was not available to ten police officers who entered a detainee's cell when he refused "to surrender . . . contraband or his other personal effects."  *Id.* at 401.  To overcome the detainee's resistance to the officers' efforts to search his pockets, one officer placed the detainee in a neckhold and one officer sat on his chest while the other officers attempted to handcuff him.  *Id.* at 402-03.  During this incident, the detainee "was begging for help" and crying for mercy.  *Id.*  The court concluded that there was sufficient evidence to conclude that these officers "reasonably should have known that in subduing and searching Simpson they maliciously used force which was grossly disproportionate to the need and was calculated to injure Simpson severely."  *Id.* at 403.

Each of these cases is easily distinguished from the instant case.  Here, the Defendant police officers restrained Bornstad and used pepper spray because he was actively and violently resisting arrest.  There is no evidence that the officers used any force at all *after* Bornstad stopped resisting.  It was Bornstad's continuing violent behavior that required a response.  And the response of the officers was perfectly reasonable under the circumstances.

[45]Plaintiff's liability expert, R. Paul McCauley, Ph.D., B.C.F.E., opines that if Defendants Baxter and Sasso were on top of Bornstad, "[s]uch police actions would be excessive, objectively unreasonable, and contrary to accepted police practices."  (McCauley Report at 5.)  We note,

ii.     Defendant Police Officers Acted Reasonably

Each of the police officer Defendants are also entitled to qualified immunity because they acted reasonably.  Officials will be entitled to qualified immunity if they were "acting reasonably in good-faith fulfillment of their responsibilities."  *Wilson v. Schillinger*, 761 F.2d 921, 929 (3d Cir. 1985).  If "there is at least some significant authority that lends support of the police action," the police officer's conduct will be subject to qualified immunity.  *Carswell*, 381 F.3d at 243 (quoting *Doe v. Groody*, 361 F.3d 232, 243 (3d Cir. 2004)).  In making this reasonableness inquiry, a court must review the circumstances known to each officer.  *Id.*  As the Third Circuit emphasized, "'we must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day.  What constitutes reasonable action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.'"  *Id.* at 244 (quoting *Smith v. Freeland*, 954 F.2d 343, 347 (6th Cir. 1992)).

It is clear from the record that reasonable police officers in the officers' positions could also find the officers' conduct to be objectively reasonable.[46]  For instance, Sergeant Moran, who

---

however, that the determination of whether an officer used an objectively unreasonable amount of force "cannot be definitively established by the testimony of an expert."  *Tofano*, 61 F. Supp. 2d at 303.  While "a court can conclude that 'one expert accurately expresses what a reasonable police officer would do, . . . [the court] is not forced to so conclude by the mere presence of an expert's opinion.'"  *Id.* at 303-04 (quoting *Gutierrez v. City of San Antonio*, 139 F.3d 441, 447 (5th Cir. 1998)).

[46]McCauley opines that

it would be sufficiently clear to a reasonably trained and competent police officer that placing Mr. Bornstad, a large and emotionally charged, agitated, and violently struggling man; suspected of domestic violence; with the odor of alcohol on his breath; who had been pepper sprayed five times by officers; in a prone position for

is not a Defendant in this action, explained that after he arrived at the scene all of the officers acted appropriately in restraining Bornstad.  He testified that "from what I witnessed everything was exactly the way it was supposed to be, exactly the way that any human being would attempt to keep control of another without causing any injury to that person."  (Moran Dep. at 42.)  A review of all of the circumstances surrounding Bornstad's arrest compels the conclusion "that officers of reasonable competence could at least disagree as to whether the officers' conduct was reasonable."  *Tofano*, 61 F. Supp. 2d at 305.  As a result, each Defendant officer is entitled to qualified immunity on Plaintiff's Fourth Amendment excessive force claim.

> b.     Qualified Immunity As Applied To Failure To Provide Medical
>        Treatment Claim

Plaintiff asserts that Defendants Baxter, Sasso, Coldren, Knoke, and Shappell are liable under § 1983 because they failed to render medical assistance to Bornstad "once they had him under control."  (Doc. Nos. 47 at 46; 48 at 44.)  A plaintiff may assert a substantive due process claim under the Fourteenth Amendment for failure to render medical care "in limited situations."  *Hogan v. City of Easton*, Civ. A. No. 04-759, 2004 U.S. Dist. LEXIS 16189, at *30-31 (E.D. Pa. Aug. 15, 2004).  In *City of Revere v. Massachusetts General Hospital*, the Supreme Court held that the Due Process Clause of the Fourteenth Amendment requires the government to provide medical care to persons "who have been injured while being apprehended by the police."  463 U.S. at 244.  A pretrial detainee may establish a Fourteenth Amendment violation arising from a

---

a prolonged period of time for handcuffing and continued prone position control is potentially dangerous, even fatal.

(McCauley Report at 5.)  However, the reasonableness of an official's conduct is a question of law for the court to decide based upon the total circumstances.  *Carswell*, 381 F.3d at 243-44. The opinion of an expert is not a substitute for proper legal analysis.

deprivation of medical care if he can show:  (1) a serious medical need; and (2) acts or omissions by police officers that reflect deliberate indifference to that need.  *Hogan*, 2004 U.S. Dist. LEXIS 16189, at *32 (citing *Natale v. Camden County Correctional Facility*, 318 F.3d 575, 582 (3d Cir. 2003)); *see also Boring v. Kozakiewicz*, 833 F.2d 468, 471 (3d Cir. 1987).  This standard requires a police officer to provide medical care to an individual who was injured during the course of an arrest when the need "is so obvious that a reasonably trained officer would recognize the necessity for attention."  *Saunders v. Spano*, Civ. A. No. 89-5498, 1990 U.S. Dist. LEXIS 17144, at *11 (E.D. Pa. Dec. 14, 1990) (citing *Walmsley v. City of Philadelphia*, 872 F.2d 546, 552-53 (3d Cir. 1989)), *aff'd*, 981 F.2d 1248 (3d Cir. 1992) (table).

As a threshold matter, we must determine whether Bornstad was in custody when the Defendant officers allegedly failed to give him appropriate medical assistance.  The protections of the Due Process Clause of the Fourteenth Amendment apply "after the initial 'seizure' has ended but the individual remains in custody."  *Price v. County of San Diego*, 990 F. Supp. 1230, 1241 n.22 (S.D. Cal. 1998) (citing Mitchell W. Karsch, Note, *Excessive Force and the Fourteenth Amendment*:  When Does Seizure End?, 58 Fordham L. Rev. 823 (1990)).[47]  Plaintiff appears to concede that Bornstad was not in the custody of the Defendant officers prior to his death.  (Doc. Nos. 47 at 46; 48 at 45.)  Even accepting Barlow's testimony, Bornstad continued to struggle against the officers after he complained that he was having difficulty breathing and

---

[47]Some courts have evaluated a claim for failure to render medical assistance during the course of an arrest using a Fourth Amendment excessive force analysis.  *Price*, 990 F. Supp. at 1241 n.22.  Here, Plaintiff does not argue that the Defendants' failure to offer medical assistance constituted excessive force.  Rather, he relies solely on the protections afforded by the Fourteenth Amendment.

that he was having a heart attack.  At no time did the officers have actual control over him until he was placed in the patrol car.

Even if we were to conclude that Bornstad was in custody and that the Fourteenth Amendment applied to this situation, we would dismiss this claim because there is no evidence that the Defendant officers exhibited deliberate indifference to a serious medical need of Bornstad.  As discussed above, even if we accept the proposition that Bornstad expressed concerns about his health, he continued to struggle against Baxter and Sasso even after those concerns were expressed.  In addition, the use of pepper spray could certainly explain any complaints about breathing.  (Hood Dep. at 77-78.)

Plaintiff points to seemingly conflicting testimony regarding the sounds that Bornstad made immediately prior to being carried to the police car.  As Shappell tied Bornstad's legs together, Coldren testified that "[h]e was still yelling, cursing, fighting, doing whatever he could to resist us."  When the officers told Bornstad to stop resisting, "he just turned around and started yelling f--- you, get away from me, stop touching me."  According to Coldren, Bornstad's use of profanities, along with his growling and yelling, stopped when he was taken to the police car.  Sasso also testified that Bornstad continued to use profanity, such as saying "f--- you," as the officers carried him to the patrol car.  Moran, however, testified that Bornstad was grunting and making various sounds and noises, but that he did not say any words.[48]  Knoke also testified that Bornstad "was moaning, a kind of half yell" when he was handcuffed behind his back.  Even if we credit Moran and Knoke's testimony, the uncontradicted evidence is that the officers held him

---

[48]Hood testified that "it would not be unexpected" to hear grunting from a person who is being compressed.  (Hood Dep. at 85.)  A person may also make "funny vocalizations," but not say anything intelligible, if he is having a hypoxic seizure.  (*Id.* at 96-97.)

down and tied his legs only because he continued to struggle.  Given the circumstances, the officers were unable to offer any form of medical assistance because of his continued resistance.  When Bornstad stopped resisting and the officers realized that he was having a medical problem, they immediately rendered medical assistance and called for an ambulance.  (Coldren Dep. at 40-41; Knoke Dep. at 39-40; Sasso Dep. at 71-72, 74-76; Shappell Dep. at 39-40.)  Their conduct was not deliberately indifferent to Bornstad's medical needs.

### 3.    § 1983 Claim Against Defendants Honey Brook and West Brandywine

Plaintiff alleges that Defendants Honey Brook and West Brandywine violated § 1983.  In a § 1983 case, a municipality cannot be held liable under a theory of respondeat superior.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  Instead, Plaintiff must identify a specific policy or custom that proximately caused the violation of Bornstad's constitutional rights.[49]  *Berg v. County of Allegheny*, 219 F.3d 261, 275 (3d Cir. 2000); *Fletcher v. O'Donnell*, 867 F.2d 791, 793 (3d Cir. 1989).  In order to establish the existence of either a policy or custom, "a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom."  *Bielevicz v.*

---

[49]A policy is made when a decisionmaker with final authority to establish policy regarding the action "'issues an official proclamation, policy, or edict.'"  *Berg v. County of Allegheny*, 219 F.3d 261, 275 (3d Cir. 2000) (quoting *Kneipp*, 95 F.3d at 1212).  A custom is a practice that is "so permanent and well settled as to virtually constitute law."  *Id.* (quoting *Kneipp*, 95 F.3d at 1212).  Custom may be shown through evidence that high-level policymakers knew about and acquiesced to the unconstitutional practice.  *Garvin v. City of Philadelphia*, Civ. A. No. 02-2214, 2003 U.S. Dist. LEXIS 2471, at *5 (E.D. Pa. Feb. 24, 2003) (citing *Fletcher v. O'Donnell*, 867 F.2d 791, 793-94 (3d Cir. 1989); *Wakshul v. City of Philadelphia*, 998 F. Supp. 585, 591 (E.D. Pa. 1998)), *aff'd*, 354 F.3d 215 (3d Cir. 2003).  Generally, "[p]roof of a single incident by lower level employees acting under color of law does not suffice to establish either an official policy or custom."  *Wakshul*, 998 F. Supp. at 591 (citing *City of Oklahoma v. Tuttle*, 471 U.S. 808, 823 (1985)).

*Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990).  In addition to identifying conduct that is properly attributable to an organization subject to § 1983, the plaintiff "must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).  If the policy or custom is facially valid, a plaintiff must establish causation by demonstrating that the defendant's action "'was taken with deliberate indifference as to its known or obvious consequences.  A showing of simple or even heightened negligence will not suffice.'"  *Berg*, 219 F.3d at 276 (quoting *Brown*, 520 U.S. at 407).

Plaintiff raises a *Monell* claim against Defendants Honey Brook and West Brandywine under 42 U.S.C. § 1983 for their asserted failure to train police officers regarding compression asphyxia.  (Pl.'s Trial Mem. at 2-3.)  "The scope of failure to train liability is a narrow one." *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 215 (3d Cir. 2001).  To establish § 1983 liability based on a failure to train theory, the plaintiff "must present evidence that the need for more or different training was so obvious and so likely to lead to the violation of constitutional rights that the policymaker's failure to respond amounts to deliberate indifference." *Id.* at 216 (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).  To establish "deliberate indifference" in this context, a plaintiff must show that:  (1) policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employee mistakes; and (3) an employee's wrong choice will often cause the deprivation of a person's constitutional rights. *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999) (citing *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992)).

43

In the instant case, Plaintiff fails to satisfy the burden of proving that the municipal Defendants violated § 1983 by failing to train police officers regarding compression asphyxia.  A defendant's failure to train its employees "can ordinarily be considered deliberate indifference only where the failure has caused a pattern of violations."  *Berg*, 219 F.3d at 276 (citing *Brown*, 520 U.S. at 408-09).[50]  Plaintiff offers no evidence that the failure of either municipality to train its police officers regarding compression asphyxia resulted in a pattern of constitutional violations.  "Although it is possible, proving deliberate indifference in the absence of such a pattern is a difficult task."  *Carswell*, 381 F.3d at 244.  Here, the police officers were faced with an unusual situation.  Bornstad actively and violently resisted arrest.  Given Bornstad's crazed response to being arrested, we fail to see how any suggested deliberate indifference on the part of the municipal Defendants played any part in this tragedy.

Plaintiff's *Monell* claim also fails because there is insufficient evidence that the purported lack of training caused a violation of Bornstad's constitutional rights.  In addition to establishing deliberate indifference, a plaintiff "must also demonstrate that the inadequate training caused a constitutional violation."  *Id.* (citing *Grazier v. City of Philadelphia*, 328 F.3d 120, 124-25 (3d Cir. 2003)).  Since there was no underlying Fourth Amendment violation, there can be no finding of liability against either municipality.  Even if Plaintiff could establish an underlying constitutional violation, Plaintiff's claim still fails because Plaintiff offers no evidence that the lack of training caused the deprivation of Bornstad's federal rights.  *Grazier*, 328 F.3d at 125

---

[50]In *Brown*, the Supreme Court explained that "in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations."  *Brown*, 520 U.S. at 409.  Here, it is not "highly predictable" that a failure to train police officers regarding compression asphyxia will lead directly to the violation of a citizen's federal rights.

(explaining that a plaintiff must show that an inadequate training policy was the "moving force" behind his injuries).  A plaintiff may not prevail on a failure to train claim by merely alleging that a different training program than the one in place would have been more effective.  *Id.*  Because there is insufficient evidence that the municipal Defendants were deliberately indifferent or that their failure to train caused a violation of Bornstad's constitutional rights, we will dismiss Plaintiff's *Monell* claim.

### B.      Wrongful Death and Survival Actions

Claims under Pennsylvania's Wrongful Death Act, 42 Pa. Cons. Stat. § 8301,[51] and Pennsylvania's Survival Act, 42 Pa. Cons. Stat. § 8302,[52] arise from the death of an individual who would have had a cause of action against the defendants.  *See Baumgart v. Keene Bldg. Prods. Corp.*, 633 A.2d 1189, 1191 (Pa. Super. Ct. 1993).  Plaintiff asserts that the Defendant police officers committed an assault and battery on Bornstad.  Under Pennsylvania law, an assault is an intentional attempt to use force to injure the person of another, while a battery occurs when the threatened violence in an assault is actually done.  *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994).  However, as the *Renk* court explained, a heightened assault and battery standard applies to police officer conduct:

> A police officer may use reasonable force to prevent interference with the exercise of his authority or the performance of his duty.  In making a lawful arrest, a police officer may use such force as is necessary under the circumstances to effectuate the

---

[51]This statute provides in pertinent part that "[a]n action may be brought . . . to recover damages for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another . . . ."  42 Pa. Cons. Stat. § 8301(a) (1998).

[52]Under this statute, "[a]ll causes of action or proceedings, real or personal, shall survive the death of the plaintiff or of the defendant, or the death of one or more joint plaintiffs or defendants."  42 Pa. Cons. Stat. § 8302 (1998).

arrest.  The reasonableness of the force used in making the arrest determines
whether the police officer's conduct constitutes an assault and battery.

*Id.*  A police officer may only be held liable for assault and battery when his use of force is

unnecessary or excessive.  *Beckwith v. Sherwood*, Civ. A. No. 00-0839, 2001 U.S. Dist. LEXIS

24079, at *17 (E.D. Pa. Oct. 11, 2001).  Here, as discussed above, the police officers used a

reasonable amount of force to restrain Bornstad, who was illegally resisting arrest.  None of the

Defendant officers committed an assault and battery on Bornstad.  In fact, it was Bornstad who

was committing an assault and battery upon the police officers who were simply attempting to

protect Barlow and her daughter from Bornstad's abusive, assaultive, criminal behavior.

Accordingly, the Plaintiff's wrongful death and survival actions must be dismissed.[53]

---

[53]While none of the Defendants have addressed the issue in their summary judgment
briefs, we also conclude that the police officer Defendants are entitled to immunity under the
Pennsylvania Political Subdivision Tort Claims Act, 42 Pa. Cons. Stat. §§ 8541-8564 (1998)
("Tort Claims Act").  Both the wrongful death and survival actions sound in tort and are
governed by the Tort Claims Act.  *See Lockwood v. City of Pittsburgh*, 751 A.2d 1136, 1140 (Pa.
2000); *Richardson v. City of Philadelphia*, 1992 U.S. Dist. LEXIS 3345, at *34 (E.D. Pa. Mar. 6,
1992).  Under the Tort Claims Act, employees generally enjoy the same broad immunity as their
employing agencies.  *DeBellis v. Kulp*, 166 F. Supp. 2d 255, 279 (E.D. Pa. 2001) ("'An
employee of a local agency is liable for civil damages on account of any injury to a person or
property caused by acts of the employee which are within the scope of his office or duties only to
the same extent as his employing local agency . . . .'" (quoting 42 Pa. Cons. Stat. § 8545)).
Furthermore, an officer may claim immunity if his actions were authorized by law, or he in good
faith reasonably believed that his actions were authorized by law.  42 Pa. Cons. Stat. § 8546(2)
(1998); *see also Beckwith*, 2001 U.S. Dist. LEXIS 24079, at *18.
     However, the Tort Claims Act provides that an employee of a local agency may be liable
for an injury caused by his act "in which it is judicially determined that the act of the employee
caused the injury and that such act constituted a crime, actual fraud, actual malice or willful
misconduct . . . "  42 Pa. Cons. Stat. § 8550 (1998).  Thus, a police officer may be liable in his
individual capacity if his acts constitute willful misconduct.  In the context of alleged police
misconduct, "willful misconduct" means that the police officers committed an intentional tort
knowing that their conduct was tortious.  *See, e.g., DeBellis*, 166 F. Supp. 2d at 279 ("In the
context of police misconduct cases, it is improper to equate willful misconduct with the
commission of an intentional tort.  Instead, there must be a determination not only that the officer
committed the acts in question, but that he willfully went beyond the bounds of the law." (citing

An appropriate Order follows.

---

*Renk*, 641 A.2d 289)); *In re City of Philadelphia Litig.*, 938 F. Supp. 1264, 1273 (E.D. Pa. 1996)
(holding that in cases involving allegations of police misconduct, "willful misconduct" under the
Tort Claims Act means "misconduct which the perpetrator recognized was misconduct and
which was carried out with the intention of achieving exactly that wrongful purpose"), *aff'd*, 158
F.3d 723 (3d Cir. 1998).  Here, there is no evidence that any of the officers engaged in willful
misconduct.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KENNETH T. BORNSTAD | : | |
| Administrator of the Estate | : | |
| of KEITH B. BORNSTAD, | : | CIVIL ACTION |
| Deceased | : | |
| | : | |
| v. | : | |
| | : | NO. 03-CV-3822 |
| HONEY BROOK TOWNSHIP, | : | |
| ET AL. | : | |

## ORDER

AND NOW, this 9th day of September, 2005, upon consideration of the following

Motions, and all papers filed in support thereof and in opposition thereto, it is ORDERED as

follows:

1. Defendants West Brandywine Township, Sergeant John Coldren, Officer Denise

Knoke, And Corporal Daniel Shappell's Motion For Summary Judgment (Doc. No. 42, No. 03-

CV-3822) is GRANTED;

2. Defendants Honey Brook Township, Officer William Baxter, And Officer Michael

Sasso's Motion For Summary Judgment (Doc. No. 43, No. 03-CV-3822) is GRANTED;

3. Plaintiff Kenneth T. Bornstad's Motion In Limine To Preclude All Evidence Of

Decedent Keith B. Bornstad's Alleged Prior Marijuana, Cocaine, Or Other Drug Use (Doc. No.

55, No. 03-CV-3822) is DISMISSED as MOOT;

4. Plaintiff's Motion In Limine To Preclude All Evidence Of Decedent Keith Bornstad's

Alleged Prior Alcohol Use (Doc. No. 56, No. 03-CV-3822) is DISMISSED as MOOT;

5. Plaintiff's Motion In Limine To Preclude All Evidence Of Decedent Keith Bornstad's

Prior Arrests And Charges (Doc. No. 57, No. 03-CV-3822) is DISMISSED as MOOT;

6.   Defendants' Joint Motion In Limine To Preclude Lorraine Barlow's Testimony (Doc. No. 58, No. 03-CV-3822) is DENIED;

7.   Defendants' Joint Motion In Limine To Preclude Any Evidence From Plaintiff's Liability Expert, R. Paul McCauley (Doc. No. 59, No. 03-CV-3822) is GRANTED in part and DENIED in part;

8.   Defendants' Joint Motion In Limine To Preclude Any Hearsay Testimony From Angela Eckert (Doc. No. 60, No. 03-CV-3822) is DENIED;

9.   Defendants' Joint Motion In Limine To Preclude Trial Testimony Of Plaintiff's Expert, Ian C. Hood, M.D., Ch.D., J.D. (Doc. No. 61, No. 03-CV-3822) is DENIED;

10.   Defendants' Joint Motion In Limine To Preclude Testimony Of Dr. Rodger Rothenberger (Doc. No. 64, No. 03-CV-3822) is DENIED;

11.   Defendants' Joint Motion In Limine To Preclude Reference To The Use Of OC Spray By The Police Officers As Having Been Improper Or Having Contributed To Bornstad's Death (Doc. No. 65, No. 03-CV-3822) is DENIED;

12.   Defendants' Joint Motion In Limine To Preclude Reference To "Blue Wall" Or "Blue Line" (Doc. No. 68, No. 03-CV-3822) is DISMISSED as MOOT;

13.   Defendants' Joint Motion In Limine To Preclude Reference To Any Meeting Of The Defendant Officers With Their Fraternal Order Of Police Attorney As Having Been Improper (Doc. No. 69, No. 03-CV-3822) is DISMISSED as MOOT;

14.   Defendants Honey Brook Township, Officer William Baxter, And Officer Michael Sasso's Motion In Limine To Preclude Plaintiff From Presenting Any Evidence Of Events Involving William Baxter That Occurred Subsequent To The Bornstad Incident (Doc. No. 73, No. 03-CV-3822) is DISMISSED as MOOT;

15.  Plaintiff's Motion To Preclude Testimony Of Dr. G. John DiGregorio As To Decedent Bornstad's Alleged Use Of Cocaine And To Preclude His Testimony Under Daubert And Rule 403 That The GCMS Is A Better Diagnostic Tool Than The FPIA (Doc. No. 84, No. 03-CV-3822) is DENIED; and

16.  Judgment is entered in favor of Defendants West Brandywine Township, Sergeant John Coldren, Officer Denise Knoke, Corporal Daniel Shappell, Honey Brook Township, Officer William Baxter, and Officer Michael Sasso and against Plaintiff Kenneth T. Bornstad, Administrator of the Estate of Keith B. Bornstad, Deceased.

IT IS SO ORDERED.

BY THE COURT:

S:/R. Barclay Surrick, Judge